IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

CASE NO.:_____

SAMANTHA M. MARKLE,

    Plaintiff,

v.

MEGHAN MARKLE,

    Defendant.
_____/

## COMPLAINT FOR DAMAGES

Plaintiff, SAMANTHA M. MARKLE, by undersigned counsel, hereby files this Complaint for Damages against Defendant, MEGHAN MARKLE, and alleges the following:

### INTRODUCTION

1. Plaintiff – who suffers from multiple sclerosis and is confined to a wheelchair – brings this action for defamation based on demonstrably false and malicious statements made by her half-sister to a worldwide audience, including roughly 50 million people in 17 countries who watched the Oprah Winfrey interview with the Defendant, Meghan Markle, and her husband, Prince Harry of England. Defendant also published and disseminated false and malicious statements about the Plaintiff in a New York Times best-selling book, *Finding Freedom,* and in many newspapers and media outlets worldwide.

2. Defendant, MEGHAN MARKLE (hereinafter "Meghan''), became Her Royal Highness, The Duchess of Sussex, following her marriage to His Royal Highness, Prince Harry of England, The Duke of Sussex, in May 2018. Meghan – who was featured with Prince Harry on the cover of Time Magazine's annual feature on "The World's Most Influential People" —

published and disseminated false and malicious lies designed to destroy Plaintiff's reputation and which have subjected Plaintiff to humiliation, shame and hatred on a worldwide scale. Defendant used the powerful resources of the Royal Family's public relations operation to disseminate and spread lies worldwide about the Plaintiff and Defendant's own Father in a premeditated campaign to destroy their reputation and credibility so they could not interfere with or contradict the false narrative and fairy tale life story concocted by the Defendant.

3.      On March 7, 2021, CBS aired a "Primetime Special" — viewed by approximately 50 million people worldwide — featuring Oprah Winfrey interviewing Meghan and Prince Harry. During the interview, in a calculated effort to damage and discredit the Plaintiff and her published autobiography, the Defendant *falsely* and maliciously stated that: (1) she was "an only child"; (2) she last saw the Plaintiff "at least 18, 19 years ago and before that, 10 years before that"; and (3) Plaintiff only changed her surname to Markle in her early 50s when Meghan started dating Prince Harry.

4.      Defendant and her agents have intentionally promoted and published the false and malicious narrative that Plaintiff has only met the Defendant "a handful of times" in her life, but that Plaintiff has created a shameful career selling fabricated stories to the press about the Defendant's childhood. The defamatory implication is that Plaintiff had no relationship whatsoever with her sister Meghan, they were virtual strangers and that Plaintiff has created a lucrative career selling false stories to tabloids and television programs when she knows nothing about Defendant's childhood.

5.      In November 2021, the Defendant's intentional plan to defame the Plaintiff was exposed when the Defendant's Communications Secretary (public relations representative), Jason Knauf, disclosed in a British court case that the Defendant had instructed him by email to meet

with two biographers and disseminate the false statements that: (1) the Defendant was "an only child" who only met the Plaintiff "a handful of times"; (2) the Plaintiff only changed her surname to Markle after Defendant started dating Prince Harry to cash in on her newfound fame; and (3) that the Plaintiff is promiscuous and a bad mother who "lost custody of all three of her children from different fathers." *See* Defendant's email and Knauf articles attached as **Exhibit 1.**[1]

6.     Defendant's defamatory email to her public relations representative, Mr. Knauf, was not only published globally, but it formed the basis for a full chapter in the New York Times best-selling book, *Finding Freedom,* titled "A Problem Like Samantha."  Indeed, the first sentence of Chapter 12 disparagingly states **"The trouble began with Samantha Markle."**

7.     After *Finding Freedom* was published in August 2020, the Defendant falsely claimed in a British court proceeding that she and Prince Harry had nothing to do with the content of *Finding Freedom*, including the defamatory narrative about Plaintiff and her family prominently featured in the best-selling book.  Defendant assumed that Mr. Knauf was her loyal servant and that her scheme to defame and denigrate Plaintiff and her family would remain a secret.[2]  However, Mr. Knauf's disclosure and dissemination of Defendant's email proved she had blatantly lied in the high-profile British lawsuit that Defendant filed against a prominent newspaper.

8.     After Mr. Knauf's embarrassing disclosures, including the Defendant's incriminating email, Meghan was compelled to publicly apologize to the British court for her false

---

[1]   Mr. Knauf terminated his business relationship with Meghan because he could no longer deal with her mistreatment and bullying of employees of the Royal family and her misleading statements to the British court.

[2]   Defendant's intent to conceal her role in disseminating the false and defamatory statements about the Plaintiff was revealed in an email from Prince Harry instructing Defendant's public relations representative that the Defendant's communications to the authors of *Finding Freedom* needed to remain secret: "I totally agree that **we have to be able to say we didn't have anything to do with it.**"  *See* Prince Harry's email to Knauf attached as **Exhibit 2.**

statements, claiming she "forgot" that she had instructed Mr. Knauf to meet for several hours with the authors of *Finding Freedom* to, among other things, disseminate the defamatory statements about the Plaintiff and her family. *See* News articles re: Meghan's apology to the court attached as **Exhibit 3.**

9.  Defendant orchestrated the campaign to defame and destroy her sister's and her Father's reputation and credibility in order to preserve and promote the false "rags-to-royalty" narrative Defendant had fabricated about her life to the Royal Family and the worldwide media. For example, in a very public letter to House Speaker Nancy Pelosi and in appearances on television programs, such as the *Oprah* interview and *Ellen*[3], Meghan falsely claimed that: (a) she essentially raised herself from virtual poverty; (b) she was forced from the age of 13 to work in a series of low-paying jobs to "make ends meet"; (c) she worked to pay for her Northwestern college education; (d) she drove an old car with malfunctioning doors and had to enter and exit via the trunk; (e) she had no siblings and virtually no contact with her family; (f) her family could only afford the $4.99 salad bar at Sizzlers; (g) her Father refused to attend her wedding; and, importantly, (h) Plaintiff's published autobiography was nothing more than a book of lies (hereinafter referred to as Defendant's "fairy tale life story."). *See* Pelosi letter and news articles attached as **Exhibit 4.**

10.  In truth, Defendant's Father, Thomas Markle, was a highly successful television lighting director for 45 years on various hit television shows, including *General Hospital, Married with Children and Facts of Life;* Mr. Markle was recognized with two Emmy Awards and 13 Emmy nominations for excellence in lighting design; Mr. Markle's income placed him in the top

---

[3] Defendant willingly participated in these high profile media events after proclaiming that she and Prince Harry moved to California to establish a more normal, private life for themselves and their children away from the cameras and media attention in England.

10 percent of annual household incomes[4]; Defendant was not forced at the age of 13 to work in low-paying jobs to make ends meet; Defendant attended elite and expensive private schools and dance and acting classes in Los Angeles paid for by her Father; Mr. Markle also paid for all of Defendant's college education at Northwestern, including tuition, rent and living expenses and even took out loans to cover the considerable cost; after Defendant graduated college, Mr. Markle paid for Defendant's apartment and other expenses until she could afford to take care of herself; Mr. Markle arranged for Defendant to get a speaking part on the ABC hit show *General Hospital* so Defendant could get an Actor's Guild union card that enabled her to audition for television shows; Defendant drove a perfectly operational Ford Explorer with functioning doors; Defendant had two siblings, the Plaintiff and her brother, and Defendant had frequent and regular contact with her sister Samantha throughout her childhood; Mr. Markle regularly took Defendant to the finest and most expensive restaurants in Los Angeles; Mr. Markle suffered two heart attacks in the weeks before Defendant's wedding in May 2018 due to stress associated with the Royal wedding, the constant hounding and harassment by paparazzi and other media, and upsetting text messages he received from Defendant and Prince Harry, and Mr. Markle's cardiologist told him he was too sick to travel to England for the wedding;  Mr. Markle did not refuse to attend the wedding, but was instructed by his doctor not to attend the wedding; and just days before the Royal wedding, while Mr. Markle was in a hospital bed recovering from heart surgery, the Defendant and Prince Harry sent him hurtful texts scolding him for "working with the press" rather than conveying their concern for his life-threatening medical condition.

---

[4]  Mr. Markle's six-figure salary at ABC Television afforded Defendant an upper-middle class lifestyle, although it may now seem like a pittance to a "Duchess" living in a $21 million Santa Barbara mansion with neighbors like Oprah Winfrey, Ellen DeGeneres, Rob Lowe and Ariana Grande.

11. These truths about Defendant's life story directly contradict the false narrative and "fairy tale life story" fabricated by Defendant and widely disseminated through the Royal Family's powerful public relations operation. Defendant's intentional campaign to discredit and destroy the reputations and credibility of Plaintiff and her Father was designed to protect and preserve the false "fairy tale life story" concocted by Defendant.

## PARTIES, JURISDICTION AND VENUE

12. This is an action for damages in excess of $75,000.00, exclusive of interest, costs and attorney's fees and is a controversy between citizens of different states. As set forth below, Plaintiff's state of citizenship (Florida) is diverse from the Defendant's state of citizenship (California) pursuant to 28 U.S.C. §1332.

13. Plaintiff, SAMANTHA M. MARKLE — who resides in Lakeland, Florida — is the half-sister of the Defendant. At the time of the publication of all defamatory statements and communications set forth in this Complaint, Plaintiff was a resident and citizen of the State of Florida. As a direct result of Defendant's false and defamatory statements published to the worldwide media and the authors of *Finding Freedom*, Plaintiff has been the subject of countless derogatory news articles and regularly receives hateful and violent messages via the internet and social media while a resident and citizen in Florida.

14. Defendant, MEGHAN MARKLE, resides in Montecito, California and is a citizen of California. At the time of publication of the defamatory statements and communications set forth in this Complaint, Defendant was fully aware that Plaintiff resided in and was a citizen of Florida. When the defamatory statements in Defendant's email were published to James Knauf, Defendant intended and had actual knowledge that such defamatory and damaging statements would be published in the book *Finding Freedom* and disseminated in the worldwide media,

including throughout Florida.

15. Defendant also had actual knowledge that her defamatory and hateful statements made in the widely-promoted Oprah interview would be viewed by millions of people throughout the world, including in the state of Florida. In fact, the Oprah interview was reportedly viewed by roughly 50 million people in 17 countries. *See* Associated Press article attached as **Exhibit 5.**

16. Defendant's false and malicious statements about the Plaintiff were accessible on network television and the Internet in the state of Florida and were, in fact, accessed by third parties in the state of Florida.

17. Defendant willfully, purposefully, and intentionally directed her defamatory statements at and targeted the Plaintiff, a Florida resident and citizen. Defendant acted with actual malice and full knowledge that her statements were false and were intended to discredit and destroy Plaintiff's reputation and to enhance Defendant's reputation and credibility such that her "fairy tale life story" would go uncontested.

18. Defendant is subject to personal jurisdiction in the state of Florida pursuant to Fla. Stat. 48.193(1)(a)(2), because Defendant committed intentional tortious acts within the state of Florida.

19. Furthermore, Defendant has sufficient minimum due process contacts with Florida because she intentionally published defamatory statements with the actual knowledge and intent of causing maximum damage to Plaintiff's reputation in the state of Florida and worldwide. By intentionally publishing false and defamatory statements about Plaintiff and her family with actual knowledge and intent that the false and defamatory statements would be published and disseminated in Florida, Defendant reasonably anticipated being haled into court in the state of Florida. Indeed, Defendant's sole intent was to destroy Plaintiff's and her families' credibility and

reputation so that there would be no credible family members to dispute Plaintiff's "fairy tale life story." Thus, the exercise of personal jurisdiction over Defendant comports with traditional notions of fair play and substantial justice.

20. For all the foregoing reasons, Defendant is subject to personal jurisdiction in the state of Florida and before this Court.

21. Finally, venue is proper in the Tampa Division of the United States District Court for the Middle District of Florida, pursuant to Middle District Rule 1.04(a), because Plaintiff resides and is domiciled in Polk County, Florida; a substantial part of the events giving rise to the defamatory claims occurred and accrued in Polk County, Florida; the damage to Plaintiff's reputation occurred in Polk County, Florida; Plaintiff is being harassed and threatened in Polk County, Florida; and this Court in this Division has personal jurisdiction over Defendant pursuant to 28 U.S.C. §1391.

## FACTUAL ALLEGATIONS

### The Defendant's Secret Scheme to Defame the Plaintiff

22. By December 2018, Omid Scobie and Carolyn Durand — two authors known for reporting on Britain's Royal Family — were in the process of writing the book *Finding Freedom*, which is one of the definitive books about Prince Harry and Defendant.

23. Upon information and reasonable belief, Scobie and Durand contacted Defendant or her representatives, including Mr. Knauf, to obtain information about Defendant's life story and childhood. As noted above, Mr. Knauf was Defendant's public relations representative at that time. For the specific purpose of responding to Scobie and Durand and with actual knowledge that the information would be published in a best-selling book, Defendant sent a detailed email dated December 10, 2018 to Knauf containing false and defamatory statements regarding Plaintiff

and her family.  As stated in Defendant's email to her public relations representative: "when you sit down with them, it may be helpful to have some background reminders so I've included them below."  *See* **Exhibit 1.**

24.     Defendant had actual knowledge and the intent that the false information she provided to Mr. Knauf would be communicated to the authors and published globally in the book *Finding Freedom* and disseminated worldwide through the media.  Defendant was also aware that it was reasonably foreseeable that Defendant's email itself would be leaked to the public since such things were common and regular as a member of the Royal Family.  As intended, the false and defamatory statements in Defendant's email were communicated to the authors of *Finding Freedom* in or about December 2018 and Defendant's email itself was published worldwide on the internet in approximately November 2021.

25.     Defendant intentionally and with actual malice published the following false and defamatory statements with full knowledge of the falsity thereof and with the specific intent to cause substantial harm and damage to Plaintiff's reputation and good name:

   a.   **SAMANTHA "dropped out of high school**."  This is false.  In her attempt to discredit SAMANTHA, MEGHAN implies that SAMANTHA is an uneducated, high school dropout.  But the truth is that SAMANTHA was seriously injured from a fall from a rope swing, resulting in paralysis on her left side and blindness in one eye at that time, and she was then diagnosed with multiple sclerosis.  SAMANTHA missed school due to the paralysis, blindness, and multiple sclerosis diagnosis.  SAMANTHA completed high school and has earned two degrees, including a Masters Degree in Mental Health Counseling/Vocational Rehabilitation Counseling.

   b.   **MEGHAN saw SAMANTHA only "a handful of times" and Meghan has "never had a relationship with either of them" [SAMANTHA or TOM].**  This is false. SAMANTHA spent time with Defendant on a regular basis throughout her childhood and even lived in the same apartment house with Defendant for a period of time.  SAMANTHA picked up MEGHAN from school; took MEGHAN for ice cream and to the mall regularly, and spent many family holidays with the Defendant. MEGHAN's father was MEGHAN's primary care-giver and MEGHAN and SAMANTHA saw each other regularly.

    MEGHAN visited SAMANTHA in Virginia and attended SAMANTHA's college graduation in New Mexico in 2008 (see photo attached as **Exhibit 9**); they spoke on the telephone and exchanged emails; and MEGHAN even called SAMANTHA from the Green Room when MEGHAN was a Briefcase Model on the television show *Deal or No Deal.*

    This is an attempt by MEGHAN to create the false impression that MEGHAN was essentially an only child with no contact with other family members, or as MEGHAN stated on Oprah, that she had "no siblings." MEGHAN apparently wanted to convince the public that her family members knew nothing about her life and, thus, were not qualified to contradict the false narrative MEGHAN had fabricated about her life.

  c. **"Upon Meghan dating Harry, SAMANTHA changed her last name back to MARKLE."** This is false. SAMANTHA's surname from birth is MARKLE and MARKLE was always her maiden name. SAMANTHA has been married twice and went by SAMANTHA GRANT and SAMANTHA RASMUSSEN while married, but she never stopped using her maiden name MARKLE. This is an effort by MEGHAN to discredit SAMANTHA by falsely stating that SAMANTHA changed her name to cash-in on MEGHAN's name once she started dating Prince Harry.

  d. **SAMANTHA began a "career creating stories to sell to the press**." This is false. SAMANTHA never "created" any story to sell to the press. In fact, the media has contacted and harassed SAMANTHA on a constant basis and she agreed to be interviewed in order to defend herself from the false stories regularly published in print and television media, including those disseminated by the Defendant.

  e. **SAMANTHA had "lost custody of all three of her children**." This is false. SAMANTHA never lost custody of any of her children. This is MEGHAN trying to destroy SAMANTHA's credibility and reputation because a mother must be doing something very wrong to lose custody of her children.

  f. **SAMANTHA had three children from three different fathers**. This is false. SAMANTHA has been married twice and has three children. As one reporter noted, this is MEGHAN's attempt to "slut-shame" SAMANTHA and further destroy her credibility and reputation.[5]

---

[5] As discussed in the article attached as **Exhibit 6,** this slander by MEGHAN is commonly referred to as "slut-shaming."

  g.  **SAMANTHA brokered press deals for her father**. This is false. There has never been an interview, statement, or any sort of "press deal" that was brokered or set-up or that went through SAMANTHA. SAMANTHA never received one penny from an interview with her father. Again, MEGHAN is attempting to discredit SAMANTHA by suggesting she was selling access to her Father.

26.  The above-referenced false and defamatory statements and implications contained in Defendant's email were communicated by her public relations representative to the authors of *Finding Freedom* at the request of Defendant. As intended by Defendant, the authors published the false and defamatory information (and the defamatory implications), including Chapter 12 entitled, **"A Problem Like Samantha"** and stating: **"The trouble began with Samantha Markle."** Defendant caused these false and defamatory statements to be communicated to the authors of *Finding Freedom* with actual malice and the specific intent to damage the Plaintiff's reputation and credibility.

27.  The following false, defamatory, and defamatory by implication statements appeared in *Finding Freedom*, which was published and sold globally beginning in August 2020:

  a.  **MEGHAN had crossed paths with SAMANTHA only twice since growing up (pg. 173)**. As set forth above, this statement is completely false.

  b.  **There is only one picture of SAMANTHA and MEGHAN; "if there were more, SAMANTHA would have sold them." (pgs. 173-74).** This is completely false. There are many pictures of SAMANTHA and MEGHAN.

  c.  **SAMANTHA reached out to The Sun with her story about how snagging a royal had been MEGHAN'S lifelong ambition. (pg. 174).** This is false. SAMANTHA never contacted The Sun.

  d.  **SAMANTHA was paid "handsomely" by The Sun. (pg. 174).** This is false.

  e.  **SAMANTHA was not invited to MEGHAN'S first wedding. (pg. 176).** This is false. SAMANTHA was invited, but the wedding was in Jamaica. SAMANTHA was confined to a wheelchair due to multiple sclerosis, she had a young daughter, and she was in school at that time. For these reasons, SAMANTHA was unable to attend the wedding in Jamaica.

      f.    **MEGHAN asked her father to intervene with SAMANTHA . . . . (pg. 177).** This is false. MEGHAN never requested such an intervention with SAMANTHA. No such conversation ever occurred.

      g.    **SAMANTHA's Father told her "What you're doing is hurting your sister." (pg. 177).** This is false. No such conversation occurred between SAMANTHA and her Father.

28.    The above statements independently and taken together in Defendant's email and the best-selling book *Finding Freedom* caused substantial and irreparable prejudice, injury, and harm to Defendant's reputation to a substantial, sizable, and appreciable fraction of the relevant community. As a direct result of Defendant's false and defamatory statements disseminated to the authors of *Finding Freedom* and to the worldwide media, Plaintiff regularly receives hateful emails and messages on a regular basis and her reputation has been so damaged that she has been unable to work in her chosen profession. As just one example, Plaintiff was forced to seek and obtain an "Injunction for Protection Against Stalking" in Polk County, Florida against one of Defendant's zealous fans.[6] *See* Injunction attached as **Exhibit 7.**

**Defendant's False and Malicious Statements in the Widely Promoted Oprah Interview**

29.    On March 7, 2021, CBS aired a "Primetime Special" — viewed by approximately 50 million people in 17 countries worldwide — featuring Oprah Winfrey interviewing Meghan and Prince Harry. During the interview, in a calculated effort to damage and discredit the Plaintiff and her published autobiography, the Defendant falsely and maliciously stated that: (1) she was "an only child"; (2) she last saw the Plaintiff "at least 18, 19 years ago and before that, 10 years before that"; and (3) Plaintiff only changed her name to Markle in her early 50s when Meghan

---

[6] Although Plaintiff's legal name is Samantha Markle, the injunction action was filed under the name Samantha Rasmussen in an effort to avoid further unwanted publicity associated with her legal name, Markle, that was generating so many hateful and threatening messages.

started dating Prince Harry. *See* Transcript of Oprah Interview and Associated Press Article attached as **Exhibit 8.**

30. Defendant intentionally promoted and published the false and malicious narrative that Plaintiff has only met the Defendant "a handful of times" in her life, that they are virtual strangers, but that Plaintiff has sought to cash in on her relationship with Defendant by selling fabricated stories to the press about the Defendant's childhood.

31. Defendant made these false and defamatory statements with actual malice and the specific intent to destroy Plaintiff's reputation and credibility and to preserve and protect Defendant's false narrative about her childhood and fairy tale life story. As just one example of Defendant's malice and hatred towards Plaintiff, the Defendant demanded that her Father, Thomas Markle Sr., terminate his relationship with the Plaintiff and "disown" her if he wished to continue having a relationship with the Plaintiff.

## COUNT I -- DEFAMATION

32. Plaintiff realleges Paragraphs 1 through 31 as though fully set forth herein.

33. The Defendant's statements in Meghan's email to Knauf, the best-selling book *Finding Freedom,* the Oprah interview and the worldwide media are false and defamatory.

34. Defendant made, published and disseminated such statements with actual malice and actual knowledge that the statements were false.

35. The statements are defamatory in that they prejudiced, harmed, and injured Plaintiff's reputation and they exposed her to hatred, ridicule or contempt in her business, reputation and occupation.

36. The statements were published in Defendant's email first disclosed in November 2021; in the book *Finding Freedom* beginning in August 2020, in the Oprah interview in March

2021 and throughout the worldwide media from August 2020 to the present day.

37. Plaintiff has suffered actual damages in the form of lost employment, lost income from sales of her autobiography, emotional and mental distress, including anxiety and fear due to the threatening and violent emails and messages she receives regularly, and harm to her reputation and credibility.

WHEREFORE, PLAINTIFF demands judgment for compensatory damages and punitive damages against DEFENDANT, together with interest and costs, and such other relief as this Court deems just and proper.

## COUNT II – DEFAMATION BY IMPLICATION

38. Plaintiff realleges Paragraphs 1 through 31 as though fully set forth herein.

39. As set forth above, false statements disseminated in Defendant's email, in the best-selling book *Finding Freedom,* in the Oprah interview and in the worldwide media were defamatory by implication because Defendant intentionally and knowingly omitted facts or juxtaposed a series of facts to imply a defamatory connection between them. Among other things, Defendant's false statements created the defamatory implication that Plaintiff had no relationship whatsoever with her sister Meghan and that Plaintiff has created a lucrative career selling false stories to tabloids and television programs when she knows nothing about Defendant's childhood.

40. Defendant engaged in such defamatory by implication conduct knowingly, intentionally, and with actual malice, fully aware that she was doing such with the plan to damage, injure, and harm Plaintiff's reputation and credibility.

41. The defamatory by implication statements in fact severely damaged Plaintiff by prejudicing, harming, and injuring her reputation and credibility, and by exposing her to hatred, ridicule or contempt in her business, reputation and occupation.

42.     The statements were published in Defendant's email first disclosed in November 2021; in the book *Finding Freedom* published in August 2020, and in the Oprah interview aired in March 2021, and throughout the world-wide media from August 2020 to the present day.

43.     Plaintiff has suffered actual damages in the form of lost employment, lost income from sales of her autobiography, emotional and mental distress, including anxiety and fear due to the threatening and violent emails and messages she receives regularly, and harm to her reputation and credibility.

WHEREFORE, PLAINTIFF demands judgment for compensatory and punitive damages against DEFENDANT, together with interest, costs and such other and further relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

PLAINTIFF demands a trial by jury with respect to all matters so triable.

DATED: **March 3, 2022**            Respectfully submitted,

SCHWED KAHLE & KRESS, P.A.
11410 North Jog Road, Suite 100
Palm Beach Gardens, FL 33418
Phone: (561) 694-0070 Fax: (561) 694-0057

By: */s/ Douglas A. Kahle*
    Douglas A. Kahle, Esq.
    Florida Bar No.: 0141194
    dkahle@schwedpa.com