# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF FLORIDA

# TAMPA DIVISION

Samantha M. Markle,

              Plaintiff,

vs.

Meghan Markle,

              Defendant.

Case No. 8:22-cv-00511-CEH-TGW

## <u>DEFENDANT'S MOTION TO DISMISS AND INCORPORATED MEMORANDUM OF LAW</u>

Pursuant to Federal Rule of Civil Procedure 12(b)(6), Defendant Meghan, The Duchess of Sussex ("Meghan"), sued as "Meghan Markle," respectfully moves to dismiss Plaintiff's Complaint, Dkt. 1 ("Compl."), for failure to state a claim, and seeks recovery of reasonable attorneys' fees and costs under Fla. Stat. § 768.295.

## I.   <u>INTRODUCTION</u>

This is a defamation case without any merit. Plaintiff accuses Meghan of making various defamatory statements about her. Plaintiff's allegations are demonstrably false and the evidence would easily confirm that. But Plaintiff's Complaint fails on its own terms, *even when* the Court assumes the truth of Plaintiff's allegations for the purposes of argument, as it must do on a motion to dismiss.

As set out in more detail below, Plaintiff's Count I for Defamation (Compl. ¶¶ 32-37) and Count II for Defamation by Implication (*id.* ¶¶ 38-43) identify

17 separate statements, which are summarized in the Appendix at pages 24-25 of this Motion. Allegedly, the statements largely have their genesis in a private December 18, 2018 email from Meghan to the then-Communications Secretary of Kensington Palace, Jason Knauf, who oversaw media relations for The Duke and Duchess of Cambridge (i.e., Prince William and his wife Kate) and The Duke and Duchess of Sussex (i.e., Prince Harry and Meghan).

Plaintiff alleges Meghan sent it to Knauf in preparation for a meeting between Knauf and the authors of a book now titled *Finding Freedom*, published in August 2020. All claims based *directly* on the alleged statements in the email (Compl. ¶¶ 25.a-g; Appendix Statements ("App. St.") #1-7) are clearly time-barred under Florida's two-year statute of limitations, and are not defamatory in any event.

The statements based *indirectly* on the 2018 email (*id.* ¶¶ 27.a-g; App. St. #8-14) are contained in *Finding Freedom*. These claims all fail for the obvious reason that Meghan did not make them. The authors of *Finding Freedom* made the statements, and there are no allegations—nor could there be—that Meghan wrote that book or otherwise controlled its composition and editing. In any event, as further detailed below, the statements are non-actionable opinion and/or substantially true.

Plaintiff also alleges that Meghan made three purportedly defamatory statements in a 2021 interview with Oprah Winfrey. (Compl. ¶ 29; App. St. #15-17.) These claims also fail because Meghan's alleged statements are either non-actionable opinion or substantially true.

MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM

For all these reasons, and those set out below, the Complaint should be dismissed and Meghan awarded her fees and costs pursuant to Fla. Stat. § 768.295.

## II.   <u>BACKGROUND</u>

Meghan is married to Prince Henry of Wales (also known as Prince Harry). (Compl. ¶ 2.) The Complaint alleges that in December 2018, authors Omid Scobie and Carolyn Durand, "two authors known for reporting on Britain's Royal Family," were in the process of writing a then unnamed book about Meghan and her newlywed husband. (*Id.* ¶ 22.) Plaintiff alleges (and Meghan vehemently denies) that Scobie and Durand reached out to Meghan, including through Knauf. (*Id.* ¶ 23.) Plaintiff alleges Knauf agreed to speak to the authors on background and that Meghan sent him an email with "some background reminders" before he did. (*Ibid.*) Plaintiff alleges that the email contains seven supposedly defamatory statements. (*Id.* ¶¶ 25.a-g; App. St. #1-7.) As shown below, these statements are not defamatory.

Plaintiff does *not* allege that the email was ever forwarded to Scobie and Durand, the authors of *Finding Freedom*. Plaintiff does not even allege that Knauf *showed* them the email. Instead, Plaintiff alleges merely that it was "*reasonably foreseeable* that Defendant's email itself would be leaked to the public since such things were common and regular as a member of the Royal Family." (Compl. ¶ 24 (emphasis added); *but see infra* section III.C (pp. 8-12) [discussing the insufficiency of such allegations].) Despite the alleged probability that the email would be "leaked," it never was. Instead, the Complaint alleges that it was disclosed by Knauf during

MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM

a "high-profile British lawsuit that Defendant filed against a prominent newspaper," *The Mail on Sunday*. (Compl. ¶ 7 & Compl. Ex. 1.) As shown below, these statements are not actionable.

Scobie and Durand's book, *Finding Freedom*, was eventually published in August 2020. Plaintiff alleges that the book also contained seven purportedly "false and defamatory" pieces of "information … including chapter 12 entitled, '*A Problem Like Samantha*' and stating: 'The trouble began with [Plaintiff] Samantha Markle.'" (*Id.* ¶¶ 26, 27 (emphases altered); *id.* ¶¶ 27.a-g; App. St. #8-14.) These statements are discussed below, and the book itself is Exhibit 1 to Defendant's Request for Judicial Notice. *See generally Hoffman-Pugh v. Ramsey*, 312 F.3d 1222, 1225 (11th Cir. 2002) ("The 'publication' at issue here is the entire book, which was properly before the court on the motion to dismiss because [plaintiff] referred to it in her complaint and it is central to her claims.").

Unrelated to the December 2018 email and the book *Finding Freedom*, on March 7, 2021, CBS aired Oprah Winfrey's interview of Meghan and Prince Harry. (Compl. ¶ 29.) Plaintiff alleges that three statements over the course of the two-hour interview were purportedly defamatory. (*Id.* & Compl. Ex. 8 [excerpts of interview transcript].) As shown below, these statements are not actionable.

## III.   **ARGUMENT**

### A.   **Early Dismissals Are Particularly Appropriate in Defamation Cases.**

A Rule 12(b)(6) motion tests the legal sufficiency of a complaint's allegations.

A complaint overcomes a Rule 12(b)(6) challenge only when it alleges sufficient facts to state a claim for relief that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "[W]hen, on the basis of a dispositive issue of law, no construction of the factual allegations will support the cause of action," the complaint must be dismissed. *Allen v. USAA Cas. Ins. Co.*, 790 F.3d 1274, 1278 (11th Cir. 2015).

Under Florida law, a plaintiff in a defamation case must allege and prove that "(1) the defendant published a false statement; (2) about the plaintiff; (3) to a third party; and (4) the falsity of the statement caused injury to plaintiff." *Border Collie Rescue, Inc. v. Ryan*, 418 F. Supp. 2d 1330, 1348 (M.D. Fla. 2006). "Defamation by implication is deemed to occur (i) where there is a juxtaposition of a series of facts so as to imply a defamatory connection between them, or (ii) where a defamatory implication is created by omitting facts." *Turner v. Wells*, 879 F.3d 1254, 1269 (11th Cir. 2018) (internal quotation omitted).

Pretrial dismissal is particularly appropriate in defamation cases because of the "chilling effect" these cases have on First Amendment rights. *Karp v. Miami Herald Publ'g Co.*, 359 So. 2d 580, 581 (Fla. 3d DCA 1978) (per curiam). Both federal and Florida courts therefore stress the prominent function courts play in such cases and favor the early dismissal of untenable claims. As explained by the Eleventh Circuit, "there is a powerful interest in ensuring that free speech is not unduly burdened by the necessity of defending against expensive yet groundless litigation." *Michel v. NYP Holdings, Inc.*, 816 F.3d 686, 702 (11th Cir. 2016).

MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM

**B.      Any Claims Based on the December 2018 Email (Appendix Statements #1-7) Are Time-Barred.**

Florida has a two-year statute of limitations for defamation. Fla. Stat. § 95.11(4)(g). The statute begins to run at the time of publication, and *not* from when the defamation is or reasonably should have been discovered. *Wagner, Nugent, Johnson, Roth, Romano, Erikson & Kupfer, P.A. v. Flanagan*, 629 So.2d 113, 113–15 (Fla. 1993); *see also Silver v. Levinson*, 648 So. 2d 240, 242 (Fla. 4th DCA 1994) ("In this case, the final element of the tort was not satisfied until the letters were received by the addressees in Florida."). In other words, unlike some other jurisdictions, there is no "discovery rule" for defamation cases in Florida: "Florida courts have expressly rejected this 'discovery rule' in favor of the 'publication rule.'" *Carroll v. TheStreet.com, Inc.*, 2012 WL 13134547, at *5 (S.D. Fla. May 25, 2012) (citing cases).

This case was filed in March 2022. The email at issue was sent in December 2018. Thus, all claims based on statements made in that email are clearly time-barred because they were not filed until over three years after the statements were made. The issue is that simple.

To be sure, the limitations period begins to run anew when and if *the original speaker* "republishes" the defamatory statements. *Musto v. Bell South Tele. Corp.*, 748 So.2d 296 (Fla 4th DCA 1999). But here, while Plaintiff alleges that the *email* was "republished" in 2021, the Complaint is crystal clear that Knauf—and *not* Meghan—"disclos[ed] and disseminat[ed]" it in *The Associated Newspapers* litigation.

(Compl. ¶ 7.) There is no allegation—nor could there be—that Knauf was acting at Meghan's direction or with her authority when he did so.[1] In fact, the Complaint itself alleges that Knauf betrayed Meghan's trust by disclosing the email. (*Ibid.*)

The Complaint is also clear that Knauf introduced the email as an exhibit in the lawsuit between Meghan and Associated Newspapers, the publisher of *The Mail on Sunday*. (Compl. ¶ 7.) In light of that, no claim can be stated based on that "publication" because "absolute immunity must be afforded to any act occurring during the course of a judicial proceeding, regardless of whether the act involves a defamatory statement or other tortious behavior ... so long as the act has some relation to the proceeding." *See Levin, Middlebrooks, Mabie, Thomas, Mayes Mitchell, P.A. v. United States Fire Insurance Co.*, 639 So.2d 606, 608 (Fla. 1994). Thus, even if Knauf or Associated Newspapers' introduction of the 2018 email in litigation could be attributed to Meghan, it would be absolutely privileged.

Likewise, any attempt to argue that the email was "republished" with *Finding Freedom*'s release in August 2020 must also fail. Plaintiff does not allege that the authors of *Finding Freedom* quoted—*or even saw*—the 2018 email. Necessarily,

---

[1] Generally, "a person is not responsible for the recommunication of their original [allegedly] defamatory statement if the recommunication was done without the person's authority or request over another whom the person has no control." *Gottwald v. Sebert*, 148 N.Y.S.3d 37, 46 (N.Y. 1st App. Div. 2021). By November 2021, Knauf was no longer Meghan's Communications Secretary and therefore was not acting in the course and scope of an agency relationship. (*See* Compl. ¶ 5 & n.1; *id.* ¶ 23; Compl. Ex. 1 at p. 7; *Cabrera v. Gov't Emps. Ins. Co.*, 452 F. Supp. 3d 1305, 1317 (S.D. Fla. 2014) ("Absent control, formal agency does not exist.").)

then, Plaintiff *cannot* allege that the email was "published" or "republished" in that book—much less by Meghan—as evidenced by the book itself. (*See* RJN Ex. 1.)

In short, all claims based on statements allegedly made by Meghan in the 2018 email fail under the two-year statute of limitations because this suit was not filed until over three years after the email was sent. *See, e.g., Pierson v. Orlando Regional Healthcare Systems, Inc.*, 2010 WL 1408391 at *9 (M.D. Fla. Apr. 6, 2010) (limitations barred defamation claim based on *Wagner, Nugent*, notwithstanding allegation of subsequent republication).

### C.    As a Matter of Law, Meghan Did Not "Publish" Any of the Statements (#8-14) in *Finding Freedom*.

As to the allegedly defamatory statements in the book *Finding Freedom*, all claims based on those statements fail for the simple reason that Meghan did not make the statements. Or in legal jargon, Plaintiff fails to establish the first element of a defamation claim: the requirement that "*the defendant* published a false statement." *Border Collie Rescue*, 418 F. Supp. 2d at 1348 (emphasis added). "Because the publication of a statement is a necessary element in a defamation action, only one who publishes can be subject to this form of tort liability." *Doe v. Am. Online, Inc.*, 783 So. 2d 1010, 1017 (Fla. 2001), citing Restatement (Second) of Torts § 558(b) (1977).

Plaintiff cannot possibly allege that Meghan published the statements in *Finding Freedom*. There is no dispute that two unrelated authors wrote that book, not Meghan. And Plaintiff's allegations, on information and belief, that the then-

Communications Secretary, Knauf, passed along the supposedly defamatory statements in the 2018 email to the authors for the *authors* to use in their book (Compl. ¶ 23), do not satisfy the requirement that *Meghan* have published the statements.

Courts applying Florida law have repeatedly rejected analogous attempts to end-run the publication requirement. For example, in *Johnson v. Darnell*, 781 Fed. Appx. 961 (11th Cir. 2019), plaintiff based a defamation claim on allegations that two sheriff's deputies had made "fabrications" in a warrant application, which resulted in the plaintiff's "name and picture being posted on Alachua County's Most Wanted list." *Id.* at 964. The Eleventh Circuit held that this was *not* enough to state a defamation claim under Florida law and affirmed the district court's dismissal under Rule 12(b)(6). The Court held that to plead "a valid claim for defamation under Florida law," the plaintiff "need[ed] to allege that *the defendants themselves* were responsible for publishing the [allegedly] defamatory material—here the Most Wanted list—not that something they did indirectly led to the publication of that material." *Ibid.* (emphasis added).

Similarly, in *Klayman v. City Pages*, 2015 WL 1546173 (M.D. Fla. Apr. 3, 2015), an attorney named Larry Klayman asserted defamation claims against several defendants, including a blogger named Ken Avidor. *Id.* at *3. Klayman's claim was based on a news article for which Klayman was a *source*, but not the author. In particular, the article highlighted "a couple of nuggets buried" in an Ohio court's ruling in Klayman's divorce proceedings, which it credited Avidor for unearthing.

*Ibid.* Nonetheless, the Court held that Avidor could not be liable for the allegedly defamatory statements in the article—even though Avidor had emailed a copy of his own blog post about the ruling to the author of the article—because Avidor did not himself publish or author the article. *Id.* at *10.

The same result applies here. There are no allegations—nor could there be— that Meghan had "any control, directly or indirectly, over whether or not" the authors of *Finding Freedom* used the information in her email to the Communications Secretary in their book. *Brodsky v. Buchanan*, 217 So. 2d 338, 339 (Fla. 3d CA 1969) (affirming summary judgment for defendant, "a police inspector [in] the City of Miami," who had "forwarded the name of [plaintiff] to the office of the Sheriff of Dade County, Florida three months prior to the alleged libelous publication" but was "not shown to have had any control over the use, if any, the Sheriff's office made of this information or any control, directly or indirectly, over whether or not the Sheriff's office published anything concerning the same."). In other words, there is no showing that Meghan herself was "responsible for publishing the [allegedly] defamatory material" in a book published almost two years after she sent her email. *Johnson*, 781 Fed. Appx. at 964. That Meghan herself did not publish the allegedly false statements, and had no control over their publication—even if it were "reasonably foreseeable" that some of the statements would be used by the *Finding Freedom*'s authors—means that any defamation claim based on statements in the book by unrelated authors must fail.

The doctrine of defamation by implication does not rescue Plaintiff's claims. Absent any allegations that Meghan authored, edited or controlled the book's contents, any juxtapositions or omissions were necessarily Scobie's and Durand's—the authors of *Finding Freedom*—and *not* Meghan's. *See Jews For Jesus, Inc. v. Rapp*, 997 So. 2d 1098, 1106 (Fla. 2008) (defamation by implication arises "when a *defendant* '(1) juxtaposes a series of facts so as to imply a defamatory connection between them, or (2) creates a defamatory implication by omitting facts …") (internal quotation omitted) (emphasis added). Indeed, and to that point, Plaintiff had "spoken to the press about her distaste for Meghan" (Compl. Ex. 6 [Dkt. 1-7 at 6]) on numerous occasions, including a widely publicized *November 2016* interview with British tabloid *The Sun*,[2] so there was plenty of material available to Scobie and Durand. As such, no statements in *Finding Freedom* can support a claim for defamation by implication against Meghan.

Alternatively, Plaintiff alleges that it was at least "reasonably foreseeable that Defendant's [2018] email itself would be leaked to the public," i.e., published. (Compl. ¶ 24.) Although it was *not* "reasonably foreseeable" that a private email from Meghan to the Communications Secretary would be leaked three years later, the Court need not resolve that issue. Courts in this District have unequivocally

---

[2] See James Beal & Emily Andrews, *PRINCESS PUSHY Prince Harry's new flame Meghan Markle is 'a social climber' who 'is not fit to be royal' – according to her own SISTER*, The Sun (Nov. 1, 2016), online at https://www.thesun.co.uk/news/2096699/sister-of-prince-harrys-new-flame-warns-meghan-markle-is-a-diva-with-soft-spot-for-gingers-who-is-not-fit-to-be-a-royal/.

rejected the proposition that a defendant can be liable for a republication by a third party, over whom the defendant has no control, solely because such a republication might have been "reasonably foreseeable." *Klayman*, 2015 WL 1546173, at *10 (declining "to permit Plaintiff to proceed on [a] theory of liability" that would hold a blogger liable for a news article merely because it was "reasonably foreseeable" that the news organization would use the blog post he emailed to it as a source for the article); *Pierson*, 2010 WL 1408391, at *12 n.16 (rejecting argument that "a defendant can be liable for defamation based on third-party republication if that republication was 'reasonably foreseeable'").

These decisions make perfect sense. Given the current media environment, a case can at least be made that it is "reasonably foreseeable" that *any* high-profile person's private papers and communications will be leaked sometime in the future. Permitting a defamation claim to go forward based on such a loose standard would open public figures to defamation claims based on statements in private communications made years, or even decades, earlier. Moreover, whatever the theoretical possibilities of leaks in December 2018, Plaintiff does not allege that in November 2021, Meghan actually "placed or authorized the placement of th[is] document [the 2018 email] in the public records." *Shahnasarian v. Tejedor*, 41 So. 3d 348, 351 (Fla. 5th DCA 2010).

**D.    There Is No Overlap Between the December 2018 Email and *Finding***

**  *Freedom* in Any Case (App. St. #1, 3, 5-14).**

Publication aside, Scobie and Durand wrote *Finding Freedom*, not Meghan.

For Meghan to be liable for *Scobie and Durand*'s statements, Plaintiff must establish

that the allegedly defamatory statements are traceable to her. To that end, Plaintiff

alleges that (1) Meghan *intended* for the allegedly "false information she provided to

Mr. Knauf"—namely, statements #1-7 (Compl. ¶¶ 25.a-g)—to "be communicated to

the authors and published globally in the book *Finding Freedom*" (Compl. ¶ 24); and

(2) these statements *were* "published" in *Finding Freedom*, "including Chapter 12 …"

(*id.* ¶ 26). But, as discussed below, Chapter 12 does no such thing.

**1.    Plaintiff's defamation claim (App. St. #1, 3, 5-7).**

Even assuming *arguendo* that Knauf actually provided the supposed

"background" from Meghan to the authors of *Finding Freedom*, they used almost

none of it. The only mention of Plaintiff's education in the book is that she graduated

from college. (RJN Ex. 1 p. 171.) The book *never* claims that Plaintiff "dropped out

of high school." (Compl. ¶ 25.a; App. St. #1.) The book *never* asserts that Plaintiff

"changed her *last* name back to Markle." (Compl. ¶ 25.c; App. St. #3 (emphasis

added).) The book *never* addresses Plaintiff's children, their fathers (Compl. ¶ 25.f;

App. St. #6),[3] or whether she ever "lost custody" of them (Compl. ¶ 25.e; App. St.

---

[3] Notably, the statement that Plaintiff "had three children from *three* different fathers",
unlike the others in paragraph 25, is *not* quoted, *because it does not appear in the December 2018
email*. The email states that Plaintiff had three "children from *different fathers*" but does not
quantify the number. (Compl. Ex. 1 (emphasis added).). Regardless, the difference between

#5). So even if Plaintiff could satisfy the "publication" requirement in this manner (and she cannot), there is no basis for alleging that the authors *used* the allegedly "defamatory" information in *Finding Freedom*.

The sole possible exception is the statement in Meghan's email that Plaintiff's father "began doing press deals brokered by his daughter Samantha [i.e., Plaintiff]." (Compl. ¶ 25.g; App. St. #7.) But the allegations in the book are far more specific than mere "broker[ing]." In particular, after noting Plaintiff's "encouragement" of her father and the "cut of the deal" that she took, *Finding Freedom* describes a plot by an individual named Jeff Rayner to go "around town, putting together a few setups, including Thomas reading a book about British history at a coffee shop and visiting an Internet café to read the latest news stories on his daughter and future son-in-law." (RJN Ex. 1 p. 191; *U.S. ex rel. Osheroff v. Humana Inc.*, 776 F.3d 805, 811 n.4 (11th Cir. 2015) (on Rule 12(b)(6) motion, courts may judicially notice extrinsic documents for the "purpose of determining which statements the documents contain").) Meghan's email mentions none of these details, leading to only one conclusion: they came from the authors' other sources, not from Meghan's email. *See Five for Ent. S.A. v. Rodriguez*, 2013 WL 4433420, at *6 (S.D. Fla. Aug. 15, 2013) ("Because Plaintiffs have not clearly established that Baldiri, or any other Defendant,

---

three children having two as opposed to three fathers is immaterial. *See infra* section III.E.2 (pp. 17-18).

MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM

made the statements contained in the third-party web posts, Plaintiffs have not

established that Defendants published the statements ....").[4]

### 2. Plaintiff's defamation by implication claim (App. St. #8-14).

Plaintiff's defamation by implication claim suffers from the same defect in

reverse: instead of statements in the *email* that were not discussed in the *book* (as

above), her claim hinges on statements in the *book* that were not discussed in the

*email*. Specifically, the 2018 email said nothing about "photos," let alone that

Plaintiff "would have sold" any additional photos if she had them. (Compl. ¶ 27.b;

App. St. #9.) The 2018 email did not assert that Plaintiff "reached out to The Sun"

(Compl. ¶ 27.c; App. St. #10) or that she was paid "handsomely" by it. (Compl.

¶ 27.d; App. St. #11.) The 2018 email did not mention Meghan's first wedding and

thus necessarily said nothing of whether Plaintiff had been invited to that wedding.

(Compl. ¶ 27.e; App. St. #12.) Finally, the email did not mention any conversations

with Meghan's father about Plaintiff. (Compl. ¶¶ 27.f, 27.g; App. St. #13-14.)

---

[4] As it so happens, Plaintiff does not deny arranging staged paparazzi photos of her father.
Good Morning Britain, *Samantha Markle Concerned About Her Father Following His Heart
Attack*, YouTube (May 15, 2018), online at
https://www.youtube.com/watch?v=8iZgP1Oerig&ab_channel=GoodMorningBritain
(0:30-0:45). *See Perkins v. LinkedIn Corp.*, 53 F. Supp. 3d 1190, 1205 (2014) (taking judicial
notice of two interviews with defendant's founder, where there was no dispute as to the
"accuracy of the quotations"); *S.E.C. v. Goldstone*, 952 F. Supp. 2d 1060, 1219 (D. N.M.
2013) (noticing—on a motion to dismiss—a CNBC video interview of unchallenged
authenticity).

Indeed, the only statement supporting the defamation by implication claim that *might* be imputed to Meghan (*see* Compl. ¶ 27.a; App. St. #8)[5] requires Plaintiff to broaden the temporal scope by decades and to conflate "seeing" Meghan with *speaking* to her in order to allege "falsity." *See infra* note 6. Simply put, the email says nothing false.

In sum, for the vast majority of the statements at issue—*see* Compl. ¶¶ 25.a, 25.c, 25.e-g, 27.a-27.g; App. St. #1, 3, 5-14—there is simply no connection between Meghan's December 2018 email and the book *Finding Freedom*.

### E.   The Remaining Statements (#2-4, 15-17) Are Not Actionable.

#### 1.   Opinions are not "defamatory" (App. St. #2, 4, 15).

On top of the defects above, at least three of the allegedly defamatory statements (App. St. #2, 4, 15) are opinions. It is axiomatic that "[o]pinions cannot be defamatory." *Hoon v. Pate Constr. Co.*, 607 So. 2d 423, 429 (Fla. 4th DCA 1992).

<u>First</u>, Plaintiff takes issue with the statement that Meghan has "never had a relationship with" Plaintiff or her half-brother, Plaintiff's full biological brother. (Compl. ¶ 25.b; App. St. #2.) But as one court has found, "characterizing a relationship as 'close' … does not rise to the level necessary to support a false-light

---

[5] *Compare* Compl. Ex. 1 ("She didn't *see* her half sister again until her father asked her to attend Samantha's graduation in New Mexico when Meghan was 22 years old. She *saw* her for one day and hasn't *seen* her since."), *with* RJN Ex. 1 p. 171 ("Meghan had crossed paths with her half sister only twice *since growing up*, the most recent time being when Thomas asked her to travel with him to New Mexico for twenty-four hours to attend Samantha's college graduation in 2008.") (emphases added).

claim when the characterization is mere opinion." *Alves v. Hometown Newspapers, Inc.*, 857 A.2d 743, 755 (R.I. 2004). Such a subjective perception, at issue here, is inherently unfalsifiable. *See Dilworth v. Dudley*, 75 F.3d 307, 310 (7th Cir. 1996) (Posner, J.) (distinguishing "mere hyperbole," e.g., "scam," "fake," "phony," and "lazy, stupid, crap-shooting, chicken-stealing idiot," from "falsifiable assertions of discreditable fact") (quotation marks omitted).

Second, and for the same reason, the statement in the Oprah interview that Meghan is an "only child" (Compl. ¶ 29; App. St. #15) is pure opinion. As an initial matter, Meghan did not state that she *is* an "only child," but rather, that she "*grew up as an only child.*" (Compl. Ex. 8 (emphasis added).) Regardless, such a subjective characterization of *her own childhood* and her relationship, or lack thereof, with Plaintiff cannot support a defamation claim. Such inherently personal and individualized feelings are not falsifiable—i.e., how one feels towards their family members and how one characterizes *one's own* relationship with the father that separated from her mother (and lived elsewhere) from age 2 on.

Third, Plaintiff denies that she "began a career creating stories to sell to the press." (Compl. ¶ 25.d; App. St. #4.) This, however, is not remotely comparable to what the book's authors *actually* wrote. (*See* RJN Ex. 1 p. 173 ["While Samantha's media blitz didn't transform her into a household name, the notoriety was accompanied by cash. Samantha knew that to maintain a steady supply of the latter, she needed to keep the stories coming."]). Regardless, the email's statement as to the degree of Plaintiff's *success* or her avarice is clearly protected opinion. *See, e.g., Church*

*of Scientology v. Cazares*, 638 F.2d 1272 (5th Cir. 1981) (calling a religious group a "rip-off, money motivated organization" held non-defamatory); *Sullivan v. Barrett*, 510 So.2d 982 (Fla. 4th DCA 1987) (letter questioning physician's competence and accusing him of substandard care of patient held opinion).

### 2.   Whether Meghan last saw Plaintiff 13 or 18 years ago is immaterial for defamation purposes (App. St. #16).

Although "[a] false statement of fact is the sine qua non for recovery in a defamation action," *Hallmark Builders, Inc. v. Gaylord Broad. Co.*, 733 F.2d 1461, 1464 (11th Cir. 1984) (quotation omitted), under the substantial truth doctrine, a statement "does not have to be perfectly accurate if the 'gist' or the 'sting' of the statement is true," *Smith v. Cuban Am. Nat'l Found.*, 731 So. 2d 702, 706–07 (Fla. 3d DCA 1999).

Here, Plaintiff alleges that Meghan defamed her in the Oprah interview by roughly estimating that she had last seen Plaintiff "at least 18, 19 years ago and before that, 10 years before that."[6] (Compl. ¶ 29; App. St. #16.) But when Plaintiff last saw Meghan does not support a defamation claim for two related reasons.

<u>First</u>, Plaintiff concedes that she has not seen Meghan since Plaintiff's college graduation in 2008 (*see* Compl. ¶ 25.b), when Plaintiff was 44 years old, and 13 years

---

[6] Notably, Plaintiff does not specifically allege that she *had* seen Meghan in the 10 years *preceding* her college graduation, i.e., the "10 years before that." (Compl. ¶ 29; App. St. #16. *See* Compl. ¶ 25.b; App. St. #2.) Plaintiff does refer to *phone calls* and *emails* at unspecified times, but that is not "seeing" Plaintiff. *See* Good Morning Britain, *Samantha Markle Concerned About Her Father*, *supra* note 4 (at 2:10-2:16, admitting she "last saw her [Meghan] at my graduation ten years ago").

before the Oprah interview. And under the substantial truth doctrine, it is immaterial whether Meghan had last seen Plaintiff 13 or 18 years ago. Those five "incremental" years do not result in "significantly greater opprobrium … than would result from the [statement] without the [alleged] falsehood." *Davis v. McKenzie*, 2017 WL 8809359, at *13 (S.D. Fla. Nov. 3, 2017) (quoting *Haynes v. Alfred A. Knopf, Inc.*, 8 F.3d 1222, 1228 (7th Cir. 1993)).

Second, Meghan's statement *was* substantially true. For defamation purposes, a statement must be "substantially and materially false, not just … technically false." *Smith*, 731 So. 2d at 706–07. Thus, for example, the Northern District held that "regardless of whether K.J. was alleged by the police to have bullied 'dozens' of victims ["i.e., 24 or more"] or 'at least one' victim, the statement communicates the same 'gist' to the audience." *Jeter v. McKeithen*, 2014 WL 4996247 at *3 (N.D. Fla. Oct. 7, 2014). Just as "[t]he exact number of victims alleged to have been personally bullied"—"at least one" versus "24 or more"—was an immaterial "detail," *id.*, five additional years does not affect the "gist" of Meghan's statement, i.e., that she had not seen Plaintiff in a very long time. This claim should therefore be dismissed. *See Marder v. Tegna Inc.*, 2020 WL 3496447, at *5 (S.D. Fla. June 29, 2020) (dismissing statements that were substantially true).

### 3. Plaintiff *did* begin going by a different name (App. St. #3, 17).

The substantial truth doctrine also precludes a defamation claim based on the statement that Plaintiff "changed her name." (Compl. ¶ 25.c; App. St. #3.)

Plaintiff is suing under the name "Samantha M. Markle," but admits that she has also gone by her two married names: Grant and Rasmussen. (*Id.*) Thus, Plaintiff does not deny that she changed her name—as noted in both the December 2018 email and the Oprah Interview—but rather, asserts she was merely reverting to her maiden name at the same time that the global media reported Meghan was dating Prince Harry *and* she was, ironically, giving interviews as "Samantha Grant." (*See* Compl. ¶¶ 25.c, 29; App. St. #3, 17; fn. 2, *supra*.)

But Plaintiff does not allege that a divorce overlapped with the beginning of Meghan's relationship with her now-husband. Nor could she, because Scott Rasmussen filed for divorce from Plaintiff in 2003, well over a decade before Meghan and her now-husband began their relationship. (*See* RJN Ex. 2 [docket from *Scott Rasmussen v. Samantha M Rasmussen*, No. D-202-DM-200304974 (N.M. Dist. Ct. filed Dec. 2, 2003), showing order granting divorce on December 16, 2004].[7]) As late as September *2016*—just two months *before* Meghan's relationship was widely reported[8]—Plaintiff was still going by the name "Samantha Rasmussen." (*See* RJN Ex. 3 [docket from *Samantha Rasmussen v. Winrock Partners LLC et al*, No. D-202-CV-

---

[7] *See Paez v. Sec'y, Fla. Dep't of Corr.*, 947 F.3d 649, 652 (11th Cir. 2020) (holding that district court could take judicial notice of "online state court dockets" and "state court docket sheets" under FRE 201).

[8] *See, e.g.*, Estelle Shirbon, *TEXT-Prince Harry's statement on media "harassment" of new girlfriend*, (Reuters Nov. 8, 2016), online at https://www.reuters.com/article/britain-royals-harry-statement/text-prince-harrys-statement-on-media-harassment-of-new-girlfriend-idUSL8N1D93MU (describing "Meghan Markle" as his "girlfriend").

MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM

201605774 (N.M. Dist. Ct. filed Sept. 20, 2016)].)

These judicially noticeable materials establish that Plaintiff did not obtain an injunction using the name "Rasmussen in an effort to avoid further unwanted publicity associated with her legal name, Markle" (Compl. ¶ 28 n.6), but because *that is a name she habitually uses in legal proceedings*. Twelve years after Plaintiff's divorce was finalized, and mere months before Meghan started dating Prince Harry, Plaintiff was still going by "Rasmussen" and "Grant," but *not* by "Markle." It follows that any statements to the effect that Plaintiff "changed her name" are substantially true.

### F.  Meghan Is Entitled to Her Attorneys' Fees and Costs.

Meghan is entitled to recover her attorneys' fees and costs under Florida's anti-SLAPP statute. Florida enacted its anti-SLAPP law to spare defendants the "great expense, harassment, and interruption of their duties" from lawsuits that seek to suppress the exercise of First Amendment rights. Ch. 00-174, 2000 Fla. Laws 1; *see WPB Residents for Integrity in Gov't, Inc. v. Materio*, 284 So. 3d 555, 561 (Fla. 4th DCA 2019) (memorandum) ("The longer such suits linger, the greater the expense and interruption of the lives of the targets, the greater the threat of financial liability, and the greater the chill on the exercise of constitutional rights.").

To that end, the statute prohibits the filing of a lawsuit that (a) is "without merit" and (b) arises out of the defendant's "exercise[ ] [of] the constitutional right of free speech in connection with a public issue." Fla. Stat. § 768.295(3). "[F]ree speech in connection with a public issue" is defined broadly to include "any written or oral statement that is protected under applicable law" and "made in or in connection with

a play, movie, television program, radio broadcast, audiovisual work, book, magazine article, musical work, news report, or other similar work." *Id.* § 768.295(2)(a). The prevailing party is entitled to "reasonable attorney fees and costs incurred in connection with a claim that an action was filed in violation of this section." *Id.* § 768.295(4).[9]

This lawsuit falls squarely within the ambit of Florida's anti-SLAPP statute.

<u>First</u>, because Plaintiff fails to state a claim for the reasons set out above, her lawsuit is, by definition, "without merit." *See, e.g.*, *Parekh v. CBS*, 820 F. App'x 827, 834-36 (11th Cir. 2020) (affirming the complaint's dismissal because the disputed statement, even if false, "[was] not actionable because it [was] not defamatory" and therefore the suit was filed "without merit"); *Bongino*, 477 F. Supp. 3d at 1322 ("Because Plaintiff's suit fails to state a claim for defamation, it was without merit under Florida Statute § 768.295(3).").

<u>Second</u>, Plaintiff does not dispute that both the December 2018 email and the Oprah interview relate to "public issue[s]": namely, the subjects of a "full chapter in [a] New York Times best-selling book" and an interview "viewed by approximately

---

[9] Every federal court to consider the issue has held that Florida's anti-SLAPP statute applies in federal court. *See Bongino v. Daily Beast Co., LLC*, 477 F. Supp. 3d 1310, 1350–51 (S.D. Fla. 2020) (holding, as a matter of first impression, that Florida's anti-SLAPP fee-shifting provision could be applied in federal diversity actions); *Corsi v. Newsmax Media, Inc.*, 519 F. Supp. 3d 1110, 1128 (S.D. Fla. 2021) (citing *Bongino*); *Mac Isaac v. Twitter, Inc.*, --- F. Supp. 3d ---, 2021 WL 3860654, at *6–7 (S.D. Fla. 2021) (same); *Vibe Ener v. Duckenfield*, 2020 WL 6373419, at *4–5 (S.D. Fla. Sept. 29, 2020). *Accord Gov't Emps. Ins. Co. v. Glassco Inc.*, 2021 WL 4391717, at *5 & n.9 (M.D. Fla. Sept. 24, 2021).

50 million people in 17 countries worldwide." (*See* Compl. ¶¶ 6, 29.) Nor could she: the statements in the Oprah interview were made in a "television program … news report, or other similar work." Fla Stat. § 768.295(2)(a); *see Rosenthal v. Council on American-Islamic Relations, Florida, Inc.*, 2017 WL 6390102, at *3 (Fla. Cir. Ct. Nov. 08, 2017) (noting that Florida's anti-SLAPP statute covers "any protected statement made in a news report"). And Plaintiff alleges that the December 2018 email was made "for the specific purpose of responding to Scobie and Durand" (Compl. ¶ 23). *See* Fla. Stat. § 768.295(2)(a) ("free speech in connection with a public issue" includes "written" statement made "in connection with a … book").

"Under the anti-SLAPP law, an award of reasonable attorneys' fees and costs is *mandatory* in these circumstances." *Parekh v. CBS Corp.*, 2019 WL 2744552, at *1 (M.D. Fla. July 1, 2019); *Vibe Ener*, 2020 WL 6373419, at *5 (same); *Mac Isaac*, 2021 WL 3860654, at *6-7 (same); *Corsi*, 519 F. Supp. 3d at 1127-28 (same).

Meghan is therefore entitled to an award of fees and costs, which, if granted, will be set forth in a subsequent filing.

## IV.  CONCLUSION

Plaintiff's Complaint does not state a claim for defamation, and is directed toward constitutionally protected speech. It should be dismissed and Meghan awarded her attorneys' fees and costs in connection with this Motion.

## V.   APPENDIX

|     | Statement (source) | Compl. | Defect | Discussion |
|-----|--------------------|--------|--------|------------|
| 1.  | Plaintiff "dropped out of high school" (Compl. Ex. 1) | 25.a | SOL; no such statement in *Finding Freedom* (RJN Ex. 1) | III.B (p. 6); III.D.1 (p. 13) |
| 2.  | Defendant has "never had a relationship with" Plaintiff or her brother (Compl. Ex. 1) | 25.b | SOL; opinion | III.B (p. 6); III.E.1 (p. 16) |
| 3.  | "Upon Meghan dating Harry, [Plaintiff] changed her last name back to Markle" (Compl. Ex. 1) | 25.c | SOL; no such statement in *Finding Freedom* (RJN Ex. 1); substantial truth | III.B (p. 6); III.D.1 (p. 13); III.E.3 (p. 19) |
| 4.  | Plaintiff began a "career creating stories to sell to the press" (Compl. Ex. 1) | 25.d | SOL; opinion | III.B (p. 6); III.E.1 (p. 16) |
| 5.  | Plaintiff "lost custody of all three of her children" (Compl. Ex. 1) | 25.e | SOL; no such statement in *Finding Freedom* (RJN Ex. 1) | III.B (p. 6); III.D.1 (p. 13) |
| 6.  | Plaintiff "had three children from three different fathers" | 25.f | SOL; no such statement in either *Finding Freedom* (RJN Ex. 1) or Dec. 2018 email (Compl. Ex. 1); substantial truth | III.B (p. 6); III.D.1 & fn. 3 (p. 13); III.E.2 (p. 18) |
| 7.  | Plaintiff "brokered" press deals for her father (Compl. Ex. 1) | 25.g | SOL; substantial truth; claims are *Finding Freedom*'s own (*see* RJN Ex. 1 p. 191) | III.B (p. 6); III.D.1 & fn. 4 (p. 13) |
| 8.  | "Meghan had crossed paths with [Plaintiff] only twice since growing up" (RJN Ex. 1 p. 173) | 27.a | Misstates Dec. 2018 email (Compl. Ex. 1) | III.D.2 & fn. 5 (p. 15) |
| 9.  | If there were more photos of the parties, Plaintiff "would have sold them" (RJN Ex. 1 pp. 173-74) | 27.b | No such statement in Dec. 2018 email (Compl. Ex. 1); opinion | III.D.2 (p. 15) |
| 10. | Plaintiff "reached out to The Sun" (RJN Ex. 1 p. 174) | 27.c | No such statement in Dec. 2018 email (Compl. Ex. 1) | III.D.2 (p. 15) |

Case No. 8:22-cv-00511-CEH-TGW
MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM

| | Statement (source) | Compl. | Defect | Discussion |
|---|---|---|---|---|
| 11. | Plaintiff was paid "handsomely" by The Sun (RJN Ex. 1 p. 174) | 27.d | No such statement in Dec. 2018 email (Compl. Ex. 1) | III.D.2 (p. 15) |
| 12. | Plaintiff was "not invited to [Defendant's] first wedding" (RJN Ex. 1 p. 176) | 27.e | No such statement in Dec. 2018 email (Compl. Ex. 1) | III.D.2 (p. 15) |
| 13. | Defendant asked her father to intervene with Plaintiff (RJN Ex. 1 p. 177) | 27.f | No such statement in Dec. 2018 email (Compl. Ex. 1) | III.D.2 (p. 15) |
| 14. | Plaintiff's father told her she was "hurting [her] sister" (RJN Ex 1 p. 177) | 27.g | No such statement in Dec. 2018 email (Compl. Ex. 1) | III.D.2 (p. 15) |
| 15. | Defendant was an "only child" (Compl. Ex. 8) | 29 | Opinion | III.E.1 (p. 16) |
| 16. | Defendant last saw Plaintiff "at least 18, 19 years ago" (Compl. Ex. 8) | 29 | Substantial truth; not injurious to reputation | III.E.2 (p. 18) |
| 17. | "Plaintiff only changed her name to Markle in her early 50s" (Compl. Ex. 8) | 29 | Substantial truth | III.E.3 (p. 19) |

## VI.   LOCAL RULE 3.01(G) CERTIFICATION

Pursuant to Local Rule 3.01(g)(3), Meghan, The Duchess of Sussex hereby certifies that despite multiple attempts by the undersigned counsel to meet and confer with Plaintiff over the course of nine days, he was unable to reach Plaintiff as of the date of this filing, as set forth in the accompanying Declaration of Michael Kump.

RESPECTFULLY SUBMITTED this 13th day of May, 2022

KINSELLA WEITZMAN ISER KUMP
HOLLEY LLP

_____

**Michael J. Kump** (Cal. Bar No. 100983)*
mkump@kwikhlaw.com
**Jonathan Steinsapir** (Cal. Bar No. 226281)*
jsteinsapir@kwikhlaw.com
**Nicholas C. Soltman** (Cal. Bar No. 277418)*
nsoltman@kwikhlaw.com
808 Wilshire Boulevard, 3rd Floor
Santa Monica, California 90401
Telephone: 310.566.9800
* *Pro hac vice application pending*

BITMAN O'BRIEN & MORAT PLLC
**Ronnie Bitman** (Fla. Bar No. 744891)
rbitman@bitman-law.com
255 Primera Blvd., Ste 128
Lake Mary, FL 32746-2168
Telephone: 407.815.3115

Attorneys for Defendant Meghan, The
Duchess of Sussex (sued as "Meghan Markle")

MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that the foregoing has been furnished to all parties registered to receive service via CM/ECF this 13th day of March, 2022.

BITMAN O'BRIEN & MORAT PLLC

/s/ Ronnie Bitman, Esq.
**Ronnie Bitman** (Fla. Bar No. 744891)
rbitman@bitman-law.com
255 Primera Blvd., Ste 128
Lake Mary, FL 32746-2168
Telephone: 407.815.3115

Attorneys for Defendant Meghan, The
Duchess of Sussex (sued as "Meghan Markle")

777092

Case No. 8:22-cv-00511-CEH-TGW
MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM